ADAMS TV OF MEMPHIS, INC.,
Licensee of WHBQ–TV,
Plaintiff/Appellant,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, LOCAL 474 and Bernard Lilton, Defendants/Appellees.

Court of Appeals of Tennessee,
Western Section,
at Jackson.

April 29, 1996.

Application for Permission to Appeal Denied by Supreme Court Sept. 3, 1996.

Gary K. Smith and Archie K. Sanders, Shuttleworth, Smith, McNabb & Williams, Memphis, for plaintiff/appellant.

Dan M. Norwood and James R. Becker, Jr., Norwood, Phillips, Deboo, Howard & Grubb, Memphis, for defendants/appellees.

TOMLIN, Senior Judge.

Adams TV of Memphis, Inc. ("plaintiff") filed suit in the Circuit Court of Shelby County against the International Brotherhood of Electrical Workers, Local 474 ("IBEW") and Bernard Lilton ("defendant" or by name) seeking to have that court vacate an arbitration award that reinstated Lilton's employment after plaintiff discharged him. The trial court denied plaintiff's application to vacate. On appeal, plaintiff has presented one issue for our consideration: whether the trial court erred in denying plaintiff's application to set aside the arbitration award on the grounds that the arbitrator exceeded his powers. For the reasons hereinafter stated, we affirm the judgment of the trial court.

There appears to be no dispute as to the basic facts. Plaintiff and IBEW entered into a collective bargaining agreement that cov-

ered all "technicians" employed by plaintiff's television station in Memphis. Under the agreement, IBEW could submit to arbitration any grievance that arose from the interpretation, application, or compliance with any of the agreement's terms. In regard to plaintiff's right to discipline and discharge its employees, Article III of the agreement reads as follows:

> Section 1—It is agreed that the rights of the management of the Company (the "Management") have been bargained, and include, but are not limited to, the following:
>
> . . . .
>
> H. To establish reasonable rules of employee conduct;
>
> I. To relieve Technicians from duty because of lack of work or other legitimate reasons.
>
> Section 2—The Company shall also have the exclusive right to direct its employees, the right to hire, promote, demote, transfer, discharge or discipline for just cause and to maintain discipline among employees, and generally manage the Company's business as it deems best.
>
> Section 3—The Company construes and the Union recognizes the specific provisions of this bargaining Agreement as constituting limitations and the only limitations upon Company's right to manage its business.

Article X of the agreement defined the scope of the arbitrator's power to resolve grievances:

> The decision of the arbitrator shall be in writing, shall be conclusive, final and binding upon the parties, and shall be complied with promptly. *The arbitrator shall have no power to change, add to, subtract from or modify this agreement.* (emphasis added).

As an employed technician, Lilton was covered by the agreement. Plaintiff terminated Lilton's employment following a series of incidents that plaintiff characterized as "continual misconduct, insubordination, inattention to detail and lack of cooperation." An arbitration hearing was held after IBEW filed a grievance on behalf of Lilton. At that hear-

ing, plaintiff presented the following summaries of Lilton's incidences of misconduct.

> 2/22/90—Grievant's failure to spot check a recording of "A Current Affair" resulted in the broadcast "sitting on black" for about 15 minutes. (Performance of duty)
>
> 1/31/91—Upon a complaint from Susan Christenbury about the grievant being slow, Coughlan went to the Record Room and told the grievant that rolling back and forth between machines was inefficient. Lilton said he could cue faster his way rather than walking. When Coughlan left, Lilton was still doing it his way. Later on that day Coughlan told Lilton that if he didn't change, "it would come to a bad end for him." (Performance of duty and insubordination)
>
> 2/1/91—Lilton was needed in the Record Room and no one knew where he had gone. Shortly afterwards he was seen on the carport deck. He'd been told many times to let the switcher know when he left his post. (Inattention to duties)
>
> 2/4/91—After learning he was needed in Record Room, Coughlan saw Lilton in the hall and told him to go show tape to Tim Lynch and others. Later Coughlan saw someone else showing Lynch. (Insubordination)
>
> 2/19/91—Coughlan noticed Lilton peeking through a crack in the door in the Creative Service Room while other people were doing his work in the Record Room. He told him to come out. Later that day Lilton left Record Room without notice of where he was going. Later saw him walking from car to building. (Inattention to duties)
>
> 2/20/91—Lilton went to his immediate supervisor, Dick Romine, and to Coughlan to report equipment problems. He tried to get another employee to leave her post to be a witness for him. Some of the "trouble tickets" (problems) reported by Bernard could be duplicated. (Misconduct)
>
> 2/21/91—Romine asked Lilton to work overtime from 4:00 to 5:30 when the

relief could come in to work until midnight. Lilton said he could work 4:00–12:00, but not 4:00–5:30. (Lack of cooperation)

3/6/91—Lilton was asked by fellow employees to make a "cart dub" and change the number on the dub sheet. He refused, and in violation of long-standing policy, demanded that Mattei come to record room to make the change herself. (Lack of cooperation)

3/6/91—Lilton told Romine in a "telling manner" that he was going to load up a tape machine and start recording at the correct time, and if the Satellite receiver 2.3 was not working properly, he was going to record it anyway. Lilton had exhibited this trait several times previously. (Misconduct)

Following the initial incident plaintiff gave Lilton a written reprimand. Lilton received no further warnings from plaintiff prior to his dismissal.

The arbitrator in his opinion set aside Lilton's discharge, but gave him a fourteen day disciplinary suspension. Although the arbitrator agreed with plaintiff that the long list of incidents of misconduct made "an excellent case" for Lilton's termination, nonetheless he found that plaintiff did not have "just cause" to terminate Lilton as required by the agreement. The arbitrator's decision stated in part:

Combining the good with the bad, the picture of the grievant that the testimony portrays is the that of a well-educated, well-trained, capable employee of nine years, who, for whatever reason, in the past year progressively became inattentive to his work and sullen, fractious and uncooperative towards management and fellow employees alike.

. . . .

... What I'm getting to is that fairness (call it just cause) will not allow the Company to go along over a period of time with the grievant committing more or less benign offenses one after another until one day, having withstood all of the offensive behavior that it was able, to summarily terminate him. Just cause required that an employee be made aware that a particular behavior or behavior pattern will or has put his job in jeopardy.

. . . .

Although use of progressive discipline is not a requirement of either the contract or the principle of just cause where in the past the Company has used the typical first-step warning, and we are not dealing with one of the "major" offenses, the employee has a right to be told, if not formally, then certainly plainly that his job is at risk and what he must do to salvage it. No one did this with Lilton.

Thereafter, plaintiff filed an application in the Shelby County Circuit Court pursuant to T.C.A. § 29–5–313(a) (Supp.1995), seeking to have the court vacate the arbitration award on the ground that the arbitrator exceeded his powers under the collective bargaining agreement. Following a hearing, the trial court denied plaintiff's application on the grounds that it did not have the power to set aside the arbitration award.

This state has adopted the Uniform Arbitration Act, T.C.A. §§ 29–5–301 to 29–5–320 (Supp.1995). This Act "governs the scope of judicial review of arbitration awards." *International Talent Group, Inc. v. Copyright Management, Inc.*, 769 S.W.2d 217, 218 (Tenn.App.1988). Specifically, T.C.A. § 29–5–320 provides that "[t]his part shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it."

In *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445 (Tenn.1996), our supreme court sought to clarify and restate the standards of review to be utilized in an arbitration case. The supreme court held that based upon the policy of providing finality of arbitration awards and decisions, judicial review of arbitration decisions is limited. Based upon *Arnold*, this court does not have jurisdiction to review the merits of arbitration decisions, even if the parties allege that an award rested on errors of fact or misrepresentation of the contract. When reviewing decisions of the trial court, this court must accept the trial court's findings of fact unless they are "clearly erroneous." *Id.* at 449. The court also set forth the standard of

review by this court pertaining to questions of law:

> Matters of law, if not able to be resolved by resort to controlling statutes, should be considered independently, with the utmost caution, and in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution.

*Id.* at 450.

■ The vacation of an arbitration award is provided for in T.C.A. § 29–5–313(a), which reads in part as follows:

> Vacation of award.—(a) Upon application of a party, the court shall vacate an award where:
>
> . . . .
>
> (3) The arbitrators exceeded their powers.

Plaintiff contends that the arbitrator's construction of "just cause" as requiring plaintiff to warn Lilton prior to discharge violates the collective bargaining agreement by imposing a system of progressive discipline not bargained for by the parties. As a result, plaintiff contends that the arbitrator "exceeded his powers" under the agreement.

■ The collective bargaining agreement provided that an employee may be discharged for just cause, but is silent as to what procedural prerequisites attach to the requirement that discharge be for just cause. Because the procedural requirements for just cause are ambiguous in this agreement, interpretation by the arbitrator was appropriate. *Chauffeurs, Teamsters & Helpers Local Union No. 878 v. Coca–Cola Bottling Co.,* 613 F.2d 716, 719 (8th Cir.1980).

As defendants correctly point out, there is a substantial body of arbitral decisions holding that the term "just cause" includes not only the substantive element of appropriate factual circumstances justifying discharge, but also the procedural requirement, frequently referred to as "industrial due process," which requires an employer to warn an employee that his conduct may result in discharge and give the employee the opportunity to explain his behavior before he is disciplined. *See* Julius G. Getman, *Labor Arbitration and Dispute Resolution,* 88 YALE L.J. 916, 921 (1979). In this case, although the arbitrator agreed with plaintiff that the listed instances of misconduct made "an excellent case" for termination, plaintiff had not warned Lilton that his conduct would result in dismissal or given Lilton an opportunity to defend himself against the charges.

The arbitrator was hired by the parties to interpret the terms of the collective bargaining agreement. Because plaintiff failed to adequately warn Lilton that his conduct may result in dismissal, the arbitrator held that his discharge was not for "just cause." The arbitrator's holding incorporates notions of industrial due process and does not exceed his powers under the collective bargaining agreement. Based on the deference this court should afford arbitral decisions announced in *Arnold,* the arbitrator's decision must be upheld by this court.

Accordingly, the judgment of the court below is affirmed. Costs in this cause on appeal are taxed to plaintiff, for which execution may issue if necessary.

CRAWFORD, P.J., and FARMER, J., concur.